**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SEKOU CHERIF, Derivatively on Behalf of Nominal Defendant NAVAN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ARIEL COHEN, AMY BUTTE, ANNE GIVISKOS, BEN HOROWITZ, ARIF JANMOHAMED, MICHAEL KOUREY, CLARA LIANG, SANDESH PATNAM, ILAN TWIG, ANRÉ WILLIAMS, and OREN ZEEV,<br><br>Defendants,<br><br>and<br><br>NAVAN, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Sekou Cherif ("Plaintiff"), through the undersigned counsel, brings this derivative complaint for the benefit of nominal defendant Navan, Inc. ("Navan" or the

"Company"), against current and former members of the Company's Board of Directors (the "Board") and certain executive officers to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.

Plaintiff alleges the following based on personal knowledge regarding himself and his own acts, and on information and belief regarding all other matters, following, inter alia, an investigation conducted by and through Plaintiff's attorneys that included, among other things: a review of Defendants' publicly available documents; conference call transcripts and announcements made by Defendants; filings with the United States Securities and Exchange Commission ("SEC"); press releases published by and regarding Navan; legal filings; news reports; securities analysts' reports about the Company; filings in the securities class action captioned *McCown v. Navan, Inc., et al.*, Case No. 3:26-cv-01550-CRB (N.D. Cal.) (the "Securities Class Action"); and other publicly available information.

## NATURE OF THE ACTION

1. Plaintiff brings this shareholder derivative action on behalf of Navan against certain of its officers and members of the Company's Board (the "Individual Defendants") for breaches of their fiduciary duties between at least October 30, 2025, and March 25, 2026, both dates inclusive (the "Relevant Period"), and violations of federal securities laws.

2. Navan is a business travel technology company that describes its mission as reimagining business travel through a platform powered by its proprietary artificial intelligence ("AI") framework. Navan states that it serves its primarily business travel customers through a "unified, end-to-end" ecosystem where businesses can manage corporate travel plans, payments, expenses, meetings, events, VIP travel services, and "Bleisure" (i.e., the intersection of personal travel and business travel).

3. On June 20, 2025, after repeated attempts to access the public markets for investment, Navan again sought to go public and formally announced that it had confidentially submitted a Draft Registration Statement on Form S-1 to the SEC (the "DRS"). Unlike its earlier attempts, however, Navan chose to pursue the IPO during a federal government shutdown.

4. Following the DRS filing and before the shutdown, Navan received pushback from the SEC regarding its Form S-1. The SEC asked the Company to include, among other things, additional information in future registration statements concerning the composition of Navan's revenue, including contributions from various Company product offerings and customer categories. Navan declined that request and proceeded to file an amended Draft Registration Statement on Form S-1 with the SEC on July 28, 2025 (the "DRS/A") without disaggregating its revenue figures. On September 19, 2025, the Company filed its Registration Statement on Form S-1 with the SEC (the "S-1"). By then, a government shutdown was approaching. Numerous media outlets and the SEC had indicated that the shutdown would directly halt the SEC's work and its ability to review and accelerate registration statements. The government shutdown began on October 1, 2025, and the SEC stopped reviewing registration statements.

5. Notwithstanding these circumstances, on October 10, 2025, Navan filed an amended Registration Statement on Form S-1 with the SEC (the "S-1/A"). On October 31, 2025, Navan filed a Prospectus on Form 424B4 with the SEC (the "Prospectus," and together with the DRS, DRS/A, S-1, and S-1/A, the "Registration Statement"). After the SEC ceased ordinary review during the shutdown, the Registration Statement became automatically effective on October 29, 2025, pursuant to Section 8(a) of the Securities Act, 15 U.S.C. § 77h(a), two days before Navan's fiscal third quarter closed on October 31, 2025. Navan's Class A common stock began trading on October 30, 2025, and the IPO closed on October 31, 2025, during the government shutdown.

6. Up until the IPO, and after, Navan and the Individual Defendants indicated that Navan was a company with successful growth strategies. The Registration Statement emphasized, among other things, that: (i) the Company was adept and could navigate a transition from being a private venture-backed company to a public company under the leadership of Defendant Butte; (ii) Navan was rapidly progressing towards profitability; (iii) Navan's current revenue growth was outpacing its operating expenses; (iv) Navan had undertaken successful acquisitions, like the acquisition of Reed & Mackay ("R&M"), which expanded Navan's capabilities and enhanced its

platform; (v) the Company's products were offered through a single, "unified, end-to-end" platform wherein Navan's various travel offerings operated together as one business with common economics, contributing to the Company's reported growth on the same underlying platform; (vi) the Company's receivables from its corporate credit card program would remain conservative and were "generally due within ten days"; and (vii) the Company's "decrease in bad debt expense" was attributable to "shorter payment terms." Together, the Registration Statement presented Navan as a business with demonstrated growth with a disciplined approach to risk that was on track to profitability with a significant Total Addressable Market ("TAM").

7. In fact, Navan was struggling at the time of the IPO. By the time the Company completed the IPO as its third fiscal quarter neared its end, many of the representations in the Registration Statement were materially false and misleading.

8. The truth began to emerge immediately after Navan's common stock began trading on October 30, 2025. On the first day of trading, Navan's stock price fell to a close of $20.00 per share, down $5.00 per share from its initial offering of $25.00 per share amid public reporting that proceeding without ordinary SEC staff review created additional offering risk. In the weeks following the IPO, analysts, including those affiliated with Navan's IPO underwriters, disclosed information that had not been included in the Registration Statement, including quarterly usage-yield trends, which was the assumption underlying Navan's $185 billion TAM and the Company's product mix. Morgan Stanley proposed a $19.00 per share price target, $6.00 less than the Company initially offered, and stated that Navan's claimed $24 billion Bleisure opportunity was unsupportable and should not be included in the Company's TAM.

9. The truth continued to emerge on December 15, 2025, when the Company issued a press release announcing its third quarter results for fiscal year 2026 (the "3Q26 Press Release").[1] The 3Q26 Press Release reported a GAAP net loss of $225 million, compared to $42 million in the third quarter of fiscal year 2025. It also reported increased operating expenses and

[1] Navan's fiscal year ends on January 31. Therefore, fiscal years 2026 and 2025 refer to Navan's fiscal years ending January 31, 2026 and January 31, 2025, respectively.

a quarterly usage yield of only 6.9%, compared to 7.5% in the prior year. The 3Q26 Press Release further announced that Defendant Butte would leave her position as Chief Financial Officer ("CFO") effective January 9, 2026.

10. On the same day, the Company held an earnings call for analysts and investors to discuss its third quarter results for fiscal year 2026 (the "3Q26 Earnings Call"). During the 3Q26 Earnings Call, Defendant Butte identified "headwinds" affecting the Company, including "Reed & Mackay," and that the Company would reverse its more conservative credit policies.

11. Analysts reacted negatively to this news, focusing on how Navan's IPO was not enough to turn Navan profitable, highlighting its $225 million quarter loss "more than five times its losses a year ago." Analysts also identified Defendant Butte's departure from Navan as unorthodox and intentional, with analysts stating that "Butte framed her exit as planned." Moreover, some analysts expressed concerns that expanding customer credit would expose the Company to materially greater credit risks, "causing losses due to an increase in doubtful accounts."

12. On this news, the Company's stock price declined $1.74 per share, or approximately 11.8%, to close at $12.90 per share on December 16, 2025.

13. In the months that followed, analyst reports showed that the decline in the Company's usage yield reflected structural business issues existing at the time of the IPO, rather than ordinary quarter-to-quarter fluctuations. On January 20, 2026, Loop Capital reported that:

> A key investor concern following Navan's F3Q print was the downward slide in usage yield – the effectiveness at converting GBV into revenue – which declined to 6.9% from 7.5% a year earlier. Management attributed a third of the F3Q drop to one-time IPO-related accounting changes (reclassifying some usage revenue to subscriptions) and headwinds from the higher-yield Reed & Mackay business becoming a smaller part of the mix, and faster growth in the lower-yielding PLG segment.

14. The truth fully emerged on March 25, 2026, when the Company held an earnings call for analysts to discuss its fourth quarter and full year results for fiscal year 2026 (the "4Q26 Earnings Call"). Prior to the 4Q26 Earnings Call, the Company disseminated prepared remarks

from Defendant Cohen (the "4Q26 Prepared Remarks"). In the 4Q26 Prepared Remarks, Defendant Cohen abandoned a central premise of the Registration Statement -- that the Company provides a single, unified, usage-based platform -- explaining that ***"[t]o truly understand*** the power of our business, it is important to understand the ***economics and relative scale of our two primary service models*** - our AI-powered model delivered through our core Navan platform and our white-glove human agent powered service model delivered by Reed & Mackay ("R&M")." Defendant Cohen further revealed for the first time that R&M accounted only for ***"just over 20%"*** of Navan's revenue, was a "more costly" operation, and had grown ***"in the low single digits,"*** while Navan's core platform had grown in "the high forties." Such disclosures directly contradicted Navan's previous representations in the Registration Statement to the SEC and investors.[2]

15. From the IPO through this final disclosure, the Company's stock price declined $15.85 per share, or approximately 63.4%, from its initial listing at $25.00 per share to close at $9.15 per share on March 25, 2026.

16. As set forth herein, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material facts to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, inter alia, that: (i) Defendant Butte intended to depart from her CFO position following the IPO; (ii) the Company had increased its operating expenses during the third quarter of fiscal year 2026, resulting in a quarterly net loss of $225 million; (iii) the Company's usage yield had declined by the time of the IPO to 6.9%, down from 7.5% in the prior year; (iv) the Company's usage yield was being affected by various headwinds and undisclosed accounting changes; (v) R&M was not integrated into Navan's unified platform, but was a separate, slower-growing segment that represented roughly 20% of the Company's revenue and negatively impacted the Company's usage yields, margins, and financial performance; (vi) the Company

[2] All emphasis added unless otherwise noted.

overstated its TAM by $24 billion by including the "Bleisure" market; (vii) Navan sought to relax its payment terms and credit practices that it had described in the Registration Statement; (viii) the Company failed to maintain adequate internal controls; and (ix) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

17. As a result of the foregoing, on February 23, 2026, the Securities Class Action was filed in this Court against the Company, the Individual Defendants, and certain underwriters of the IPO.

18. The Individual Defendants' misconduct directly and proximately caused the Company to incur significant financial losses, including the cost of defending and potentially paying class-wide damages in the Securities Class Action, together with additional losses such as reputational harm and loss of goodwill.

19. Moreover, because of the breaches of fiduciary duty committed by the Individual Defendants, most of whom are current directors of the Company, their collective participation in fraud, the substantial likelihood of liability for the directors in this derivative action and for Defendants in the Securities Class Action, their mutual beholdenness, their longstanding business and personal relationships, and their lack of disinterestedness and/or independence, a majority of Navan's Board cannot consider a demand that the Company commence litigation against themselves and the other Individual Defendants with the requisite disinterestedness and independence. Plaintiff therefore did not make a demand on the Board because, as detailed further herein, demand would have been futile and useless.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims present a federal question under Section 11(f) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k(f)(1), and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(f). Plaintiff's claims likewise present a federal question

with respect to the claims asserted in the Securities Class Action based on violations of the Exchange Act.

21. Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over Plaintiff's state law claims.

22. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23. In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

24. Venue is proper in this District under Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Navan maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

25. Plaintiff is, and has been at all relevant times, a continuous shareholder of Navan.

26. Nominal Defendant Navan is a Delaware corporation whose principal executive offices are located at 260 California Avenue, Floor 2, Palo Alto, California 94306. Navan's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "NAVN."

27. Defendant Ariel Cohen ("Cohen") co-founded Navan and has served as the Company's Chief Executive Officer ("CEO"), Chairman of the Board, and a director since February 2015. Defendant Cohen is also named as a defendant in the Securities Class Action. According to the proxy statement filed by the Company on Schedule 14A with the SEC on May

12, 2026 (the "2026 Proxy"), Defendant Cohen received $1,630,623 in total compensation in fiscal year 2025, and $18,228,646 in total compensation in fiscal year 2026.

28. Defendant Amy Butte ("Butte") served as the Company's CFO from June 2024 until January 2026. Defendant Butte is also named as a defendant in the Securities Class Action. According to the 2026 Proxy, Defendant Butte received $22,670,421 in total compensation from the Company in fiscal year 2026.

29. Defendant Anne Giviskos ("Giviskos") served as the Company's Senior Vice President, Strategic Finance, and Chief Accounting Officer at least from the time of the IPO until April 2026. Defendant Giviskos also served as Interim CFO between January 2026 and March 2026. Defendant Giviskos is named as a defendant in the Securities Class Action. According to the 2026 Proxy, Defendant Giviskos received $1,673,553 in total compensation from the Company in fiscal year 2026.

30. Defendant Ilan Twig ("Twig") co-founded Navan and has served as the Company's Chief Technology Officer ("CTO") and as a director of the Company since February 2015. Defendant Twig is also named as a defendant in the Securities Class Action. According to the 2026 Proxy, Defendant Twig received $1,460,600 in total compensation in fiscal year 2025 and $9,590,152 in total compensation in fiscal year 2026.

31. Defendant Ben Horowitz ("Horowitz") has been a director of the Company since 2018 and also serves as Chair of the Company's Compensation Committee. Defendant Horowitz is named as a defendant in the Securities Class Action.

32. Defendant Arif Janmohamed ("Janmohamed") has served as a Company director since 2017 and as a member of the Company's Nominating and Corporate Governance Committee. Defendant Janmohamed is named as a defendant in the Securities Class Action.

33. Defendant Michael Kourey ("Kourey") has served as a director of the Company since 2024. He also serves as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee. Defendant Kourey is named as a defendant in the Securities Class Action.

34. Defendant Clara Liang ("Liang") has served as a director of the Company since 2022 and as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. Defendant Liang is named as a defendant in the Securities Class Action.

35. Defendant Sandesh Patnam ("Patnam") has served as a Company director since 2022 and as a member of the Company's Audit Committee. Defendant Patnam is named as a defendant in the Securities Class Action.

36. Defendant Anré Williams ("Williams") has served as a Company director since 2025 and as Chair of the Company's Nominating and Corporate Governance Committee. Defendant Williams is named as a defendant in the Securities Class Action.

37. Defendant Oren Zeev ("Zeev") has served as a Company director since 2015 and as a member of the Company's Audit Committee. Defendant Zeev is named as a defendant in the Securities Class Action.

38. Defendants Cohen, Butte, Giviskos, Twig, Horowitz, Janmohamed, Kourey, Liang, Patnam, Williams, and Zeev are collectively referred to herein as the "Individual Defendants" and with Navan, "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39. Because of their positions as officers and/or directors of Navan and their ability to control the Company's business and corporate affairs, the Individual Defendants owed Navan and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. They were and are required to use their utmost ability to control and manage Navan in a fair, just, honest, and equitable manner and to act in furtherance of Navan's and its shareholders' best interests.

40. Each director and officer of the Company owes Navan and its shareholders a fiduciary duty to exercise good faith and diligence in administering the Company and using and preserving its property and assets, together with the highest obligation of fair dealing.

41. By virtue of their control and authority as Navan's directors and/or officers, the Individual Defendants were able to, and did, exercise control directly and/or indirectly over the wrongful acts alleged herein.

42. In discharging their duties, Navan's officers and directors were required to exercise reasonable and prudent supervision over the Company's management, policies, controls, and operations.

43. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and due care and diligence in managing and administering the Company's affairs and using and preserving its property and assets. The conduct alleged herein reflects a knowing and culpable violation of those obligations, an absence of good faith, or reckless disregard for duties to the Company and its shareholders that the Individual Defendants knew or should have known posed a risk of serious injury to the Company.

44. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect, and to prevent, the dissemination of inaccurate or untruthful information concerning the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including false and/or materially misleading information regarding the Company's business, prospects, and operations. They also had a duty to cause the Company to disclose in its regulatory filings with the SEC all facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would reflect truthful, accurate, and fairly presented information.

45. To discharge their duties, the officers and directors of Navan were required to exercise reasonable and prudent supervision over the Company's management, policies, practices, and internal controls. Those duties required the officers and directors, among other things, to:

i. Ensure that the Company operated diligently, honestly, and prudently in accordance with the laws and regulations of Delaware and the United States and pursuant to Navan's own Code of Business Conduct and Ethics (the "Code of Conduct");

ii. Conduct the Company's affairs in an efficient, business-like manner so as to enable it to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

iii. Remain informed about how Navan conducted its operations and, upon receiving notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection with them and take steps to correct those conditions or practices;

iv. Establish and maintain systematic and accurate records and reports of Navan's business and internal affairs, together with procedures for reporting those matters to the Board, and periodically investigate, or cause an independent investigation to be made of, those reports and records;

v. Maintain and implement an adequate and functioning system of internal legal, financial, and management controls so that Navan's operations would comply with all applicable laws and its financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

vi. Exercise reasonable control and supervision over public statements made by the Company's officers and employees and over any other reports or information that the Company was required by law to disseminate;

vii. Refrain from improperly benefiting themselves or other Company insiders at the expense of the Company; and

viii. Examine and evaluate reports of examinations, audits, or other financial information concerning the Company's financial affairs, and make full and accurate disclosure of all material facts concerning, inter alia, each subject and duty set forth above.

46. Each Individual Defendant also owed Navan and its shareholders a duty of loyalty requiring that, while conducting the Company's affairs, each favor Navan's interests and those of its shareholders over his or her own and refrain from using his or her position, influence, or knowledge of the Company's affairs for personal advantage.

47. At all relevant times, the Individual Defendants acted as agents of one another and of Navan and acted within the course and scope of that agency.

48. Because of their advisory, executive, managerial, and directorial positions with Navan, each Individual Defendant had access to adverse, non-public information concerning the Company.

49. The Individual Defendants' positions of control and authority enabled them to, and they did, exercise control directly or indirectly over the wrongful acts alleged herein and over the contents of Navan's various public statements.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

50. In committing the wrongful acts alleged herein, the Individual Defendants pursued or joined a common course of conduct and acted in concert and conspired with one another to advance their wrongdoing. They caused the Company to conceal the true facts alleged herein and aided and abetted and/or assisted one another in breaching their respective duties.

51. Among other things, the purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

52. The Individual Defendants carried out their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, leave the misrepresentations uncorrected, and violate applicable laws.

53. To advance this plan, conspiracy, and course of conduct, the Individual Defendants took collectively and individually the actions set forth herein. Because those actions occurred under the Board's authority, each Individual Defendant who is a Navan director was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

54. Each Individual Defendant aided and abetted and provided substantial assistance in the wrongs alleged herein. In substantially assisting that wrongdoing, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either

participated directly in or substantially assisted its accomplishment, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55. At all relevant times, each Individual Defendant acted as the agent of every other Individual Defendant and of Navan and acted within the course and scope of that agency.

## NAVAN'S CODE OF CONDUCT

56. Navan's Code of Conduct provides that it "applies to all our employees, contractors, consultants, agents, representatives, officers, and members of our Board of Directors (the "Board"), including all our subsidiaries and group companies."

57. In its section titled "Our Values," the Code of Conduct states, in relevant part, that it "is designed to promote the following values and principles in our business":

> - **Honest and ethical conduct.** You are expected to disclose conflicts of interest, engage in clear and honest communication, treat your colleagues with respect, and act like a responsible corporate citizen.
> - **Compliance with applicable laws, rules, and regulations.** You should know and comply with the laws, rules, and regulations that apply to your work here at Navan.
> - **Accountability**. You are accountable for understanding and adhering to this Code, reporting violations of this Code, and acting like an ambassador in all that you do for Navan.

58. The Code of Conduct addresses "Conflicts of Interest" and states:

> You must act within guidelines that prohibit real and potential conflicts of interest with your role at Navan. Generally, conflicts of interest are situations that divide your loyalty between Navan, on the one hand, and your own personal interests, on the other. Determining whether a conflict of interest exists is not always easy to do. Even the appearance of a conflict of interest could create a problem.

59. In its "Complying With the Law" section, the Code of Conduct states, in relevant part:

> Everyone at Navan is expected to comply with the law. Although it's impossible to know all aspects of every law, you should understand the major laws, rules and regulations that apply to your work. You should consult with our Legal team if you are unsure or have any questions or concerns related to your work.

- **Insider Trading.** You may find yourself in possession of material nonpublic information (as defined in our Insider Trading Policy) about Navan, our customers, partners or other third parties. We never buy or sell securities based on material nonpublic information, nor do we tip off others to do so. This violates our policies, and it is illegal. To learn more, please review our Insider Trading Policy, which explains how you lawfully can trade in our stock, as well as our trading windows, blackout periods and trading plans. . . .
- **Fair Sales and Marketing Practices.** We compete vigorously for business based solely on the merits of our products and services. We want to win, but win fairly. We will accurately represent Navan and our products and services in our marketing, advertising, sales materials, and in comparisons between us and our competitors. Deliberately misleading messages, leaving out important facts or false claims about our products and services or competitors are inconsistent with our policies.

60. The section titled "Financial Matters and Business Practices" of the Code of Conduct states:

> The integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. You are expected to act responsibly and exercise sound judgment with respect to our finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. We also rely upon our accounting and other business and corporate records in preparing publicly-filed reports. Securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosure, and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. The making of false or misleading entries is strictly prohibited.

61. The Code of Conduct further addresses "Using and Protecting Our Assets, Systems and Facilities" and states, in relevant part:

> You have a responsibility to protect Navan's assets and ensure their efficient use. This means we protect and care for company equipment (like your laptop computer) and our business records, intellectual property, and confidential information.
>
> You should be familiar with our security policies and standards, which are hosted on Navan's intranet. Here are a few specific areas where you should take care . . .

- **Retaining Records.** Our records and information are important assets that comprise our corporate memory and contain information critical to the continuity of our business. This includes transaction records and other electronic records, such as e-mail, voicemail, messaging apps and computer drives. You must manage business records and dispose of them only in the manner and timeframe established by our document retention policies. Please be especially cautious with records and information that are subject to a "legal hold." When there is a "legal hold" in place, you may not alter, destroy or discard documents relevant to the lawsuit, legal proceeding or investigation.

62. In the section titled "Communicating With Others," the Code of Conduct states:

> We are committed to providing accurate, timely and clear disclosure in our public communications. Because any external communications can affect our business, you must be thoughtful and conscientious about what you say and write in public on Navan's behalf. In general, only people who have been specifically authorized may speak on behalf of Navan without prior approval. If you are approached by anyone such as a member of the press, analyst, or current or potential investor of Navan, please refer the individual to our public relations team.

63. The Code of Conduct's section titled "Penalties for Violations of Navan Policies" states:

> You are expected to be familiar with and comply with all Navan policies. If you have a question regarding any course of conduct, consult your manager or your People Success Business Partner before moving forward. Those who violate our policies are subject to disciplinary action up to and including termination of employment as well as civil and/or criminal penalties as prescribed by relevant rules and regulations. Examples of misconduct that may result in disciplinary measures include, but are not limited to, violating any Navan policy, failing to report known or suspected violations of any Navan policy, failure to cooperate in an investigation into possible violations of Navan policies, or engaging in retaliation.

64. The Code of Conduct addresses "Reporting Concerns" and states:

> If you have a concern about actual or possible violations of this Code or any of our policies, you are required to report it promptly. You may raise any concern orally or in writing through several channels. Use the channel that is most comfortable for you. Your manager is often in the best position to resolve a concern quickly. However, you can always report a concern to anyone on the People Success Team,

> the next level of management or anonymously. Consult the process set forth in our Whistleblower Policy for additional ways to report concerns.
>
> Please note that nothing in this Code (nor any other Navan policy or agreement) limits, impedes, or restricts your ability to contact, report to, or file a charge or complaint with, the SEC, or any other federal, state, or local government agency or commission ("Government Agencies") at any time. This Code also does not limit your ability to participate and/or assist in any investigation or proceeding that may be conducted by any Government Agencies, including providing documents or other information without notice to Navan. Nothing in this Code limits your right to seek and/or receive an award for information provided to any Government Agencies or prohibits you from providing truthful information in response to a subpoena or other legal process.

## NAVAN'S AUDIT COMMITTEE CHARTER

65. Navan's Audit Committee Charter states that the Committee's purpose is to "assist the Board in fulfilling its oversight responsibilities with respect to":

> - The Company's accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports; . . .
> - The Company's compliance with legal and regulatory requirements, including compliance with the Company's code of conduct; and
> - The review and assessment of the Company's risk management, risk assessment and major risk exposures with respect to financial, accounting, operational, tax, privacy and cybersecurity and information technology risks.
>
> The Committee will also prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.
>
> In furtherance of its purpose, the Committee will endeavor to maintain and foster an open avenue of communication among the Committee, the Auditors, the Company's financial management and the internal auditors.

66. In the section titled "Responsibilities," the Audit Committee Charter assigns the Audit Committee, among others, the following responsibilities:

> 1. **Audited Financial Statement Review.** The Committee will review and discuss with management and the Auditors, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10- K to be filed with the SEC, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations." Following this review, the Committee will recommend whether or

not such financial statements should be included in the Company's Annual Report on Form 10-K. . . .

3. **Quarterly Results Review.** The Committee will review and discuss with management and the Auditors, as appropriate, the quarterly financial statements, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the results of the Auditors' review of such financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10Q, and any other matters required to be communicated to the Committee by the Auditors under applicable PCAOB standards.

4. **Earnings Press Releases.** The Committee will discuss with management and the Auditors, as appropriate, earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies, including the use of pro forma, non-GAAP or adjusted information, which discussions may be general discussions of the type of information to be disclosed and the type of presentation to be made and, with respect to financial information and earnings guidance provided to analysts and ratings agencies, need not take place in advance of each earnings press release or each instance in which the Company may provide such financial information or earnings guidance to analysts and ratings agencies. . . .

11. **Management Letters.** The Committee will review with the Auditors any "management" **letter**, schedule of unadjusted differences or "internal control" letter issued, or to the extent practicable, proposed to be issued by, the Auditors and management's response, if any, to such letter or schedule, as well as any additional material written communications between the Auditors and management.

12. **Internal Control Over Financial Reporting.** The Committee will discuss and review with management and the Auditors, as appropriate, the **scope**, adequacy and effectiveness of the Company's internal control over financial reporting and any special audit steps adopted in the event of material control deficiencies. . . .

20. **Complaint Procedures.** The Committee will establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Along with management, the Chair of the Audit Committee will also receive all such complaints regarding accounting, internal accounting controls or auditing matters. Management will report to the Committee at least quarterly a summary of complaints received during the quarter and any actions taken in relation to those complaints.

> 21. **Correspondence with Regulators/Review of Certain Legal Matters.** The Committee will consider and review with management, the Auditors, outside counsel, as appropriate, and any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies as well as any other legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements.
>
> 22. **Compliance.** The Committee will review management's system to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws, as well as with its Code of Conduct. The Committee will review the Company's Code of Conduct and review any significant violations thereof and requests of waivers thereof by executive officers and directors.
>
> 23. **Related Party Transactions.** Unless otherwise approved or ratified pursuant to the Company's Related Person Transaction Policy, the Committee will review, approve or ratify and oversee all transactions between the Company and any Related Person that are required to be disclosed pursuant to Item 404(a) of Regulation S-K ("Item 404(a)"). "Related Person" shall have the meaning given to such term in Item 404(a), as amended from time to time. Discuss with the Auditors their evaluation of the Company's identification of, accounting for, and disclosure of its relationship with related parties as set forth under the standards of the PCAOB.
>
> 24. **Risk Assessment and Management.** The Committee will discuss with management and, as appropriate, the Auditors, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

## SUBSTANTIVE ALLEGATIONS

***Background***

67. Founded by Defendants Cohen and Twig in 2015, Navan is a business travel technology company that claims to reimagine business travel through a platform powered by its proprietary AI framework. The Company operated under the name TripActions, Inc. until February 2023, when it changed its name to Navan.

68. In 2020, the COVID-19 pandemic halted global business travel and caused Navan's corporate bookings to dry up, devastating its business. To survive, Navan incurred

massive debt by raising capital through high-cost term loans, taking on warehouse and asset-backed credit facilities, and securitizing its corporate card receivables, promissory notes, unsecured convertible instruments, and agreements for future equity. These measures further increased both Navan's debt and liabilities. Even so, Navan raised roughly $1.3 billion in venture capital funding from investors such as Group 11, Andreessen Horowitz, Lightspeed Venture Partners, and Defendant Zeev's investment firm, Zeev Ventures. During its final funding round in 2022, the Company raised $300 million at a $9.2 billion valuation. By July 31, 2025, approximately three months before the IPO, however, the Company had only $223.2 million in cash and cash equivalents while maintaining $657.9 million of debt.

69. As the pandemic ended, Navan sought to diversify and expand beyond travel management by developing an integrated travel-and-expense platform that incorporated travel management, corporate payments, expense management, and additional software offerings. For that purpose, the Company pursued acquisitions, including the April 2021 acquisition of R&M, a London-based, high-end travel, meetings, and events business. Acquiring R&M expanded Navan's international operations and added an established travel business with an existing global enterprise customer base and usage-based travel revenue to its portfolio.

70. Unlike other software companies, by the time of the IPO, Navan generated approximately 90% of its revenue from usage of its platform and 10% from subscriptions. Usage-based revenue was gained primarily through transaction fees from customers, travel suppliers, and payment partners when using Navan's platform. The Company generated subscription revenue through its Expense Management offering.

71. One of Navan's key metrics that it tracks is Gross Booking Volume ("GBV"), which the Company defines as the total value of travel booked through the Company's platform, including any type of transportation, accommodation, VIP status, and other bookings. Navan also tracks Payment Volume, which it defines as the total dollars spent on Navan-issued corporate cards.

72. To further promote the Company's ability to monetize travel booked on its platform, which was necessary to grow Navan's revenue, the Company also emphasized a metric it called "usage yield," which equaled usage-based revenue divided by GBV to represent the Company's "ability to convert GBV into usage-based revenue." Thus, a higher usage yield would purportedly demonstrate that Navan generated more revenue from each dollar of travel booked through its platform. While the Registration Statement did indicate that Navan's usage yield was "approximately 7%," since the Company only disclosed a limited set of usage-based revenue and GBV, investors could only calculate historical usage yields for the two years preceding the IPO and could not calculate quarterly usage yield as the Company did not provide quarterly GBV information.

73. Navan also sought to acquire new customers through both traditional sales-led growth ("SLG") and newer product-led growth ("PLG") strategies. Navan's SLG strategy relied on sales personnel targeting larger enterprise customers whereas its PLG strategy used more automated processes, like ads on social media platforms and websites, to acquire smaller customers, particularly businesses that did not already have a dedicated travel-management provider. The Company represented that its PLG strategy provided a more efficient means of reaching these smaller customers and expanding the Company into additional markets.

***<u>Despite SEC Pushback and the Government Shutdown, Navan Proceeds With Its IPO</u>***

74. On June 20, 2025, after at least three years of efforts to access public markets for investment, Navan submitted a confidential DRS on Form S-1 to the SEC. The SEC identified numerous issues in the draft and indicated that Navan needed to provide further disclosures. In a letter dated July 17, 2025, the SEC's Division of Corporate Finance provided Navan with comments on its draft Registration Statement, stating, among other things, that Navan should disaggregate its revenue by product and offering, citing Accounting Standards Codification ("ASC") 280-10-50-40 and ASC 606-10-55-89 through 55-91, and stating, in relevant part:

> ***Please revise to disaggregate revenue by type of product and by type of contract.*** For example, consider disclosing the amount of revenue generated from your travel and expense management platform, from your on-demand travel

> management services, from travel supply fees, and from partner fees, in addition to the amount of revenue earned from platform customers on a per-booking transaction, from platform customers on subscription basis, from travel supply and payment partners on a per transaction basis, and from travel supply and payment partners based on cumulative actual booking or transaction dollar volume. ***Also, consider disaggregating revenue by the type of offerings on your platform***, such as Travel, Corporate Payments, Expense Management, Meetings and Events, VIP, and Bleisure. Refer to ASC 280-10-50-40 and ASC 606-10-55-89 through 55-91.[3]

75. On July 25, 2025, Navan responded to the SEC's letter by refusing the request to disaggregate revenue and asserting that the Company's revenue growth and performance were primarily driven by its ability to convert GBV into usage-based revenue, or usage yield, and that the Company was "agnostic" as to the travel offerings its customers used. Navan maintained that all sub-factors of its usage-based revenue were affected by the same economic factors, such that further disaggregation would not provide meaningful information to investors, stating, in relevant part:

> While the Company earns revenue across multiple product offerings (e.g., Travel, Corporate Payments, Expense Management, Meetings and Events, VIP, and Bleisure) and customer categories (platform customers, travel suppliers, and payment partners), over 90% of the Company's revenue in fiscal 2025 and 2024 originated from the usage of the Company's platform, pursuant to which the Company earns revenue on a per-transaction basis or based on the cumulative actual booking or transaction dollar volume on the Company's platform from different customer categories . . . .
>
> Accordingly, the nature, amount, timing, and uncertainty of the Company's revenue is significantly dependent on a single economic factor, which is business travel spend by the Company's users over time through the usage of its platform. . . . ***The Company's revenue growth and performance are primarily driven by its ability to convert gross booking volume into usage-based revenue from the Company's various customer categories, regardless of the type of Travel offering used.*** . . .

---

[3] Letter from SEC, Division of Corporate Finance, Office of Technology to Ariel Cohen, Chief Executive Officer, Navan, Inc, 4 (July 17, 2025).

> As a result, ***the Company is generally agnostic as to the manner in which its customers and users adopt the Company's offerings***, including its various Travel offerings through which the Company earns revenue on a usage basis.[4]

76. By the time of this exchange between Navan and the SEC, the threat of a federal government shutdown had become more concrete. For example, on September 8, 2025, news outlets reported that the September 30, 2025, funding deadline was fast approaching, and that a federal government shutdown would likely cause "disruptions in [federal] agencies dependent on annual appropriations," and that markets might "experience short-term volatility. . . ."[5]

77. In anticipation of such a shutdown, the SEC published its "Operations Plan Under a Lapse in Appropriations and Government Shutdown" on August 7, 2025 (the "Operations Plan"), detailing the SEC's contingency plans in case a federal government shutdown occurred. In the Operations Plan, under a section titled "Summary of Major Functions that will be Discontinued," the SEC indicated that it would not, among other things, "review or accelerate the effectiveness of registration statements, or review or qualify offering statements, by issuers for securities offerings. . . ."[6] Moreover, on the eve of the shutdown, September 30, 2025, the SEC's Division of Corporate Finance and Division of Investment Management issued a statement stating that "[a]fter 5:30 p.m. today," the divisions would not be able to consider requests for "acceleration of the effective date of a pending registration statement or qualification of a pending offering statement" until "the SEC receives appropriations to fund its operations."[7]

78. Despite these well-publicized warnings, Navan continued its trajectory to the IPO. While many companies delayed their planned public listings as the federal government shutdown began, Navan proceeded with the IPO despite the unprecedented disruptions to the SEC's normal

---

[4] Letter from John T. McKenna, Cooley LLP to SEC, Division of Corporate Finance, Office of Technology, 7 (July 25, 2025).

[5] Dailyfed Staff, *Looming U.S. Government Shutdown*, dailyfed (Sept. 8, 2025), https://dailyfed.com/2025/09/looming-u-s-government-shutdown/

[6] SEC, Operations Plan Under a Lapse in Appropriations and Government Shutdown, 16 (Aug. 7, 2025, last revised Jan. 27, 2026)

[7] Announcement, SEC Division of Corporate Finance and Division of Investment Management, Announcement Regarding Pending Registration Statements and Offering Statements (last updated Sept. 30, 2025), https://www.sec.gov/newsroom/whats-new/joint-cf-im-shutdown- announcement-093025.

review processes. Even Navan's counsel for its IPO, Cooley LLP, stated that Navan was required to "navigate rarely used IPO processes" and "build contingency lanes" to complete its IPO, which Cooley LLP claimed made Navan's IPO one of the first technology IPOs to proceed under extraordinary shutdown procedures.[8]

79. On October 10, 2025, during the government shutdown, Navan publicly filed its S-1/A with the SEC in connection with its proposed IPO, seeking market cap up to $6.5 billion, with the Company anticipating that it could sell individual shares between $24.00 to $26.00 per share. Because the SEC's review process was suspended, no SEC staff reviewed or commented on these amendments before the IPO or contributed to the basis for the price range and offering size Navan sought. The Registration Statement became automatically effective on October 29, 2025, pursuant to Section 8(a) of the Securities Act, 15 U.S.C. § 77h(a).

80. Navan's Class A common stock began trading on October 30, 2025, and the IPO closed on October 31, 2025. In the IPO, Navan issued and sold 30,000,000 shares of Class A common stock at $25.00 per share, for gross proceeds of $750 million before underwriting discounts and offering expenses. Selling stockholders separately sold 6,924,406 shares at $25.00 per share, and Navan received no proceeds from those sales.

***False and Misleading Statements in the Registration Statement***

81. In presenting Navan as having the expertise necessary to operate as a public company, the Registration Statement described Defendant Butte as an experienced CFO of public companies who could support the Company with decades of leadership and experience, including service on public-company boards, stating, in relevant part:

> Amy Butte has served as our Chief Financial Officer since June 2024. Ms. Butte previously served as a member of our board of directors from April 2024 to June 2024. Ms. Butte has served on the boards of directors of Bain Capital Specialty Finance, Inc., a publicly traded managed specialty finance company, since July 2019 and Bain Capital Private Credit, a public non-traded business development

[8] Cooley LLP, *Rerouted But Not Delayed: How Navan's IPO Stayed the Course* (Nov. 5, 2025), https://www.cooley.com/news/insight/2025/2025-11-05-rerouted-but-not-delayed-how-navans-ipo-stayed-the-course.

> company, since April 2022. . . . Ms. Butte served as the founder of TILE Financial Inc., or TILE, a financial technology company, from 2008 to 2012. Prior to TILE, ***Ms. Butte served as Chief Financial Officer of Man Financial, Inc., or Man Financial, a brokerage firm, from 2006 to 2008. Prior to Man Financial, Ms. Butte served as Chief Financial Officer and Executive Vice President of the New York Stock Exchange from 2004 to 2006.*** Prior to the New York Stock Exchange, Ms. Butte served as an Equity Research Analyst at Bear Stearns and Merrill Lynch.

82. The Registration Statement likewise treated the loss of key management as a hypothetical risk that could harm the Company, even though Defendant Butte's impending departure had already materialized, stating, in relevant part:

> If we lose . . . key members of our management team or are unable to . . . retain executives . . . [that] we need to support our operations and growth, our business may be harmed.
>
> ***Our success and future growth depend upon the continued services of our management team*** and other key employees throughout our organization. ***The loss of key personnel***, including key members of our management team or members of our board of directors . . . ***could disrupt our operations and have a negative impact on our ability to grow our business. . . . From time to time, there may be changes in our management team resulting from the hiring or departure of executives and key employees, which could disrupt our business***. In addition, we may face challenges retaining senior management of companies we acquire. . . .
>
> ***The loss of . . . one or more of our senior management . . . could harm our business, and we may not be able to find adequate replacements***. . . . We cannot ensure that we will be able to retain the services of any members of our senior management or other key employees or that we would be able to timely replace members of our senior management or other key employees should any of them depart.

83. The Registration Statement also conveyed that revenue growth was outpacing expenses even though Navan had not achieved profitability. For example, the Registration Statement highlighted strong year-over-year revenue growth alongside shrinking annual net losses, creating the impression that the Company's operating leverage was improving, stating, in relevant part:

> Our revenue grew 33% year-over-year from $402 million in fiscal 2024 to $537 million in fiscal 2025, and grew 30% period-over-period from $254 million for the six months ended July 31, 2024 to $329 million for the six months ended July 31, 2025. ***Our net loss decreased 45% year-over-year from $332 million in fiscal***

> ***2024 to $181 million in fiscal 2025***, and increased 8% period-over-period from $93 million for the six months ended July 31, 2024 to $100 million for the six months ended July 31, 2025.

84. The Registration Statement represented that Navan had produced strong financial results in its prior third fiscal quarters. Because the IPO occurred only one day before the end of fiscal year 2026's third quarter, however, it provided no contrary disclosure regarding the Company's then-current fiscal health and suggested that the nearly complete quarter would resemble historical results, stating, in relevant part:

> We generally experience seasonality in our revenue, primarily related to seasonal travel trends of business travelers. Revenue is driven by travel volume, and our users typically travel less during holiday periods, though this effect varies regionally. ***As a result, our revenue has historically been strongest in the third fiscal quarter.***

85. The Registration Statement indicated that, although components of Navan's expenses could fluctuate, investors should expect expenses to decline as a percentage of revenue over time even if they increased in absolute dollars, stating, in relevant part:

> In the near term, we expect that our sales and marketing expenses will increase in absolute dollars as we continue to invest in our sales and marketing organization to drive continued adoption of our platform. We expect that sales and marketing expenses may fluctuate as a percentage of our revenue from period to period depending on the timing of these expenses or other factors impacting revenue, and ***to decline as a percentage of revenue over the long term.***

86. The Registration Statement also represented that the Company's research and development would decline as a percentage of revenue notwithstanding continued investment in product development, stating, in relevant part: "We expect that research and development expenses may fluctuate as a percentage of our revenue from period to period depending on the timing of these expenses or other factors impacting revenue, and ***to decline as a percentage of revenue over the long term.***"

87. The Registration Statement further represented that general and administrative expenses would likewise decline as a percentage of revenue over time, despite an anticipated

increase in absolute dollars, reinforcing the impression that Navan was rapidly approaching profitability, stating, in relevant part:

> [W]e expect that our general and administrative expenses will increase in absolute dollars for the foreseeable future. We expect our general and administrative expenses may vary from period to period as a percentage of revenue in the near term and ***to decline as a percentage of revenue in the long term***.

88. With respect to Navan's usage yield, the Registration Statement repeatedly described it as the Company's "ability to convert GBV into usage-based revenue" and its ability to monetize activity on its platform. It portrayed usage yield as "approximately 7%" for every historical period, suggesting that Navan had consistently monetized GBV at a 7% rate. For example, the Registration Statement stated, in relevant part:

> Our revenue growth depends on our ability to convert GBV into usage-based revenue. Usage-based revenue represented approximately 90% of our total revenue for fiscal 2025, fiscal 2024, and the six months ended July 31, 2025 and 2024. ***Our usage yield was approximately 7% in each of fiscal 2025 and fiscal 2024 and for the six months ended July 31, 2025 and 2024.***

89. The Registration Statement also attributed growth in usage-based revenue to increases in GBV, payment volume, customer adoption, and customer engagement, indicating that Navan's growth drivers maintained or enhanced usage yield, stating, in relevant part: "The overall increases in usage-based revenue were driven by increases in GBV and payment volume as we increased our customer base and expanded engagement with our platform and offerings by existing customers."

90. The Registration Statement also described the Company's usage yield as approximately 7%, despite the Registration Statement only showing usage yield from limited time spans ranging from 7.31% to 7.5%. Moreover, the Registration Statement did not disclose underlying data that investors could calculate the Company's actual historical usage yield for certain periods, but only reported quarterly usage-based revenue for the ten quarters ending April 30, 2023 through July 31, 2025 and only disclosed GBV for fiscal years 2024 and 2025, and the six-month period ending July 31, 2024 and 2025, as demonstrated in the chart below. However,

as the Registration Statement did not report GBV on a quarterly basis, investors could not determine the quarterly usage yield for any period at the time of the IPO.

| | FY 2024 ending January 31, 2024 | 6 months ending July 31, 2024 | FY 2025, ending January 31, 2025 | 6 months ending July 31, 2025 |
|---|---|---|---|---|
| **Usage Revenue (Reported)** | $371,728,000 | $232,448,000 | $490,356,000 | $299,698,000 |
| **GBV (Reported)** | $5.0B | $3.1B | $6.6B | $4.1B |
| **Usage Yield (Calculated)** | 7.43% | 7.50% | 7.42% | 7.31% |

91. Although Navan divided its revenue into usage-based revenue, at 90%, and subscription-based revenue, at 10%, the Registration Statement did not separately report usage-based revenue by product, service, customer category, or business line. Instead, it depicted Navan as a single, unified, end-to-end platform generating substantially all of the Company's usage-based revenue, stating, in relevant part:

> Centralized platform for user needs. Our platform enables users to address their travel, payments, and expense management needs in a single, ***unified workspace.*** Previously, users relied on a fragmented set of point solutions that required users to toggle between multiple applications, calendars, emails, printouts, and texts. With Navan, ***users can find what they need all in one place***, from logistics for events travel to bleisure to bespoke, white-glove VIP services, which can satisfy the complex requirements even the highest profile travelers, including private jets and police escorts. ***In fiscal 2025, 90% of bookings were made online or through mobile applications on our platform.***

92. The Registration Statement also emphasized that one of the Company's competitive advantages was its single, unified platform that provided its customers with all of Navan's products and services in one place. For example, the Registration Statement stated that "[o]ur ***integrated, end-to-end platform*** is designed to support the ***full spectrum of travel, payments, and expense management needs through a unified product suite*** that simplifies every step of the travel, payments, and expense management journey," that "[w]e compete by offering our customers a ***unified, end-to-end travel and expense management platform***," and that "[w]e believe the principal competitive differentiators that drive our leadership in the markets we

compete in include the following: ***Unified, end-to-end travel and management offering*** with global scale and supply presence[.]"

93. The Registration Statement also promoted the Company's acquisition strategy, citing its acquisition of R&M as an example of that success and presenting R&M as part of the broader platform rather than as a distinct product, stating, in relevant part:

> ***Our history of acquisitions for both platform expansion and the development of greater geographic expertise has demonstrated our ability to grow effectively.*** For example, we acquired R&M, a high-end travel and meeting and events business with global clientele and market reach, in April 2021, allowing us to expand our global reach, as well as expanding our capabilities around high-end, high-touch business travel, as well as meetings and events.

94. The Registration Statement further assured investors that the Company had significant growth potential through a TAM of "$185 billion globally" consisting of four segments, including "bleisure." Navan's Bleisure segment allowed employees of the Company's corporate customers to use Navan's platform to book personal trips, stating, in relevant part:

> Our personal travel offering, Bleisure, enables leisure and bleisure bookings through the Navan platform as an added benefit for users from our customers. Users are incentivized to book personal travel through our platform with access to the same inventory, discounts, and on-platform travel support offered to their employer. Additional features such as the ability to use reward points earned on our platform from helping their employer save money via their booked travel to offset costs for their personal travel booking, as well as the ability to seamlessly extend an existing business trip to accommodate personal travel further encourages the broader use of our platform.

95. The Registration Statement stated that Navan's Bleisure segment alone accounted for $24 billion, or 13%, of the Company's TAM, stating, in relevant part:

> ***We estimate our revenue opportunity in the bleisure category today to be approximately $24 billion***. According to a Euromonitor report commissioned by us, the bleisure SAM was estimated to be $324 billion in 2024, which, when multiplied by our usage yield of approximately 7% for fiscal 2025, results in a revenue opportunity of $24 billion.

96. Regarding the Company's corporate payments business, the Registration Statement represented that Navan maintained short payment terms with customers using Navan-

branded credit cards, representing receivables on its corporate cards as generally due within ten days, indicating that such cards only went to customers with minimal default risk, stating, in relevant part: "We provide virtual and physical corporate credit cards to customers of our expense management offering through issuing bank partners. Under our payment partner arrangements, we are required to prefund spend on these credit cards. ***We recognize a receivable for each transaction, and receivables are generally due within ten days.***"

97. The Company described its shorter payment terms as improving cash flow by reducing the cash used in investing activities, stating, in relevant part:

> Net cash provided by investing activities was $44.9 million for the year ended January 31, 2025 as compared to net cash used in investing activities of $108.8 million for the year ended January 31, 2024. ***The change was primarily related to a decrease in corporate card receivables driven by increased collections and faster turnover of receivables due to moving customers to more frequent payment terms.***
>
> Net cash used in investing activities was $11.1 million for the six months ended July 31, 2025 as compared to net cash provided by investing activities of $26.1 million for the six months ended July 31, 2024. ***The change was primarily related to corporate card receivables, which increased slightly during the six months ended July 31, 2025, and decreased significantly during the six months ended July 31, 2024 driven by increased collections and faster turnover of receivables due to moving customers to more frequent payment terms.***

98. The Registration Statement also represented that Navan's payment terms had reduced bad debt, stating, in relevant part: "General and administrative expense for the year ended January 31, 2025 increased by $0.5 million . . . partially offset by . . . (vi) a decrease in bad debt expense of $2.1 million, primarily driven by improved credit and collection processes ***and shorter payment terms for existing customers.***"

99. The Registration Statement presented certain "Risk Factors" as hypothetical future risks even though they had already materialized and were adversely affecting the Company. For example, it treated the possibility that growth could be costlier than expected as hypothetical, although the Company's losses had already grown to $225 million by the third quarter of fiscal

year 2026, an increase of 484% from the second quarter of 2026. Specifically, the Registration Statement stated, in relevant part:

> ***We have a history of operating losses and may not achieve or sustain profitability in the future. . . . We also expect our costs and expenses to increase in future periods, which could negatively affect our future results of operations if our revenue does not increase. . . . Our efforts to grow our business may be costlier than we expect, and we may not be able to increase our revenue enough to offset our increased operating expenses. We may incur significant losses in the future for several reasons, including the other risks described herein***, and unforeseen expenses, difficulties, complications, delays, and other unknown events. ***If*** we are unable to achieve or, once achieved, sustain profitability, the value of our business and Class A common stock may significantly decrease and our business, financial condition, results of operations, and prospects ***could*** be adversely affected.

100. The Registration Statement likewise treated the possibility that Navan's expanded PLG growth strategies might not generate enough revenue to offset expenses as hypothetical, even though the Company had already expanded those strategies and was unable to offset expenses, stating, in relevant part:

> While we ***may*** adjust our sales strategies from time to time, including investing in newer motions such as our PLG strategy and targeting different customer channels, ***we have historically acquired the majority of our customers through our SLG strategy and expect such strategy and related customer channels to remain an important driver for new customer growth in the future.*** . . .
>
> We also dedicate significant resources to sales and marketing programs, including digital advertising services. . . . ***Even if we successfully increase revenue as a result of our paid marketing efforts, it may not offset the additional marketing expenses we incur***. . . . ***If*** we are not able to effectively develop our sales and marketing capabilities and implement our marketing strategies, our business, financial condition, results of operations, and prospects could be adversely affected.

101. The Registration Statement further treated pressure on Navan's pricing strategy as a hypothetical risk that could affect the Company's business, financial condition, results of operations, and prospects, even though Navan was already experiencing materially decreasing usage yields because of enterprise customers' existing negotiated rates with major travel partners

and smaller unmanaged customers' willingness to pay for Navan's services. Specifically, the Registration Statement stated, in relevant part:

> ***If*** the prices we charge in connection with our offerings are unacceptable to our customers, our business, financial condition, and results of operations may be adversely impacted. . . .
>
> Our pricing strategy for existing and new offerings we introduce may prove to be unappealing to our customers, and our competitors could choose to bundle certain products and services competitive with ours. ***If*** this were to occur, ***it is possible that we would have to change our pricing strategies or reduce our prices, which could adversely affect our business, financial condition, results of operations, and prospects.***

102. The Registration Statement also assured investors that the Company adequately oversaw its risks and maintained sufficient internal controls, stating, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our board of directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to- day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with our board of directors at regular board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.
>
> Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through our board of directors as a whole, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. While our board of directors is responsible for monitoring and assessing strategic risk exposure, our audit committee is responsible for overseeing our major financial risk and cybersecurity exposures and the steps our management has taken to monitor and control these exposures. The audit committee also approves or disapproves any related person transactions. Our nominating and governance committee monitors the effectiveness of our corporate governance guidelines. Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

103. The statements described above were materially false and misleading when made because they failed to disclose materially adverse facts concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, inter alia, that: (i) Defendant Butte intended to depart from her CFO position following the IPO; (ii) the Company had increased its operating expenses during the third quarter of fiscal year 2026, resulting in a quarterly net loss of $225 million; (iii) the Company's usage yield had declined by the time of the IPO to 6.9%, down from 7.5% in the prior year; (iv) the Company's usage yield was being affected by various headwinds and undisclosed accounting changes; (v) R&M was not integrated into Navan's unified platform, but was a separate, slower-growing segment that represented roughly 20% of the Company's revenue and negatively impacted the Company's usage yields, margins, and financial performance; (vi) the Company overstated its TAM by $24 billion by including the "Bleisure" market; (vii) Navan sought to relax its payment terms and credit practices that it had described in the Registration Statement; (viii) the Company failed to maintain adequate internal controls; and (ix) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***<u>Navan's IPO Goes Poorly Because of the Company's Decisions to Forgo SEC Review</u>***

104. Immediately after Navan's IPO, its stock fell sharply as investors viewed the Company's decision to proceed during the government shutdown without SEC review as troubling. Because the Registration Statement did not receive the typical scrutiny applied to other public offerings and Navan went public by operation of law without traditional SEC administrative review, investors discounted the stock and worried that Navan faced additional risks.

105. On October 30, 2025, the media reacted negatively to Navan's unorthodox decision to go public during a government shutdown. *The Wall Street Journal* published an article titled "Navan Shares Fall 20% in Biggest IPO During Shutdown," portraying the decision to

proceed without the SEC's normal review process as hasty and risky and distinguishing it from companies that postponed their IPOs, stating, in relevant part:

> Navan's performance could give pause to other companies looking to stage initial public offerings during the shutdown. . . .
>
> Companies including Unilever, which was set to spin off its Magnum Ice Cream unit, have cited the political stalemate as a reason for delaying plans.
>
> But the SEC provided a workaround to companies who wanted to proceed: Listing paperwork would be automatically deemed effective 20 days after companies filed a price range for their offerings.
>
> Setting ranges nearly three weeks in advance can be risky given the many variables that can affect valuations in that time period.[9]

106. Similarly, *TechCrunch* noted that, "[d]espite this risk" associated with the lack of normal SEC review during the government shutdown, "Navan decided to proceed with its IPO," and that "[t]he stock's initial decline is likely influenced, at least in part, by this regulatory uncertainty."[10]

107. On the first trading day, October 30, 2025, Navan's stock price fell sharply from its offering price of $25.00 per share to a closing price of $20.00 per share, a decline of approximately 20%.

***The Truth Slowly Emerges Post-IPO***

108. The truth began to emerge on November 23, 2025, when analysts released reports demonstrating that material information was omitted from Navan's Registration Statement. For example, Goldman Sachs published a report on November 23, 2025, where it revealed that Navan had deliberately slowed the growth of its payment business because of capital constraints eighteen months earlier, a decision not disclosed in the Registration Statement: "Subscription revenue

---

[9] Corrie Driebusch, Navan Shares Fall 20% in Biggest IPO During Shutdown, The Wall Street Journal (Oct. 30, 2025), https://www.wsj.com/finance/stocks/software-firm-tests-ipo-waters-during-shutdown-19aad64d.

[10] Marina Temkin, Navan IPO Tumbles 20% After Historic Debut Under SEC Shutdown Workaround, TechCrunch (Oct. 30, 2025), https://techcrunch.com/2025/10/30/navan-ipo-tumbles-20-after-historic-debut-under-sec-shutdown-workaround/.

comes from the expense management business and growth is partly tied to cross sell from the payments business. ***Navan slowed the payments business ~1.5 years ago*** due to improved cash flow in the face of capital constraints."

109. On November 24, 2025, Needham published a report containing a chart of Navan's quarterly financials, including reported usage yield, which the Registration Statement did not disclose. Although the Registration Statement disclosed usage yield for four discrete, overlapping periods, Needham's report showed that usage yield had declined year over year in every quarter since Navan's fourth quarter of fiscal year 2025:

| **Period** | **2Q25** | **3Q25** | **4Q25** | **1Q26** | **2Q26** |
|---|---|---|---|---|---|
| **Reported Usage Yield** | 8.0% | 7.5% | 7.4% | 6.9% | 7.5% |
| **Y/Y Growth** | 4.0% | 0.7% | -0.7% | -0.9% | -6.2% |

110. Also on November 24, 2025, Morgan Stanley issued a report on Navan setting a $19.00 per share price target, despite having underwritten and sold nearly 1.84 million shares in Navan's IPO at $25.00 per share. Among its concerns, Morgan Stanley analyzed the Company's $185 billion TAM, arrived at a core TAM of $125 billion, and treated the Bleisure opportunity as optionality above that core TAM rather than as part of the core opportunity, stating, in relevant part:

> To assess how durable growth can be at Navan, ***we deconstructed the TAM to get a sense of how realistic management's TAM estimate of $185 billion is.*** Through our analysis, we arrive at a core TAM of $125 billion with optionality to be even larger when including additional small businesses and business leisure (Bleisure) travel. . . .
>
> ***While management includes the business leisure (Bleisure) opportunity in their TAM, this is a product that is still in its early lifecycle so we prefer to view it as optionality above the core TAM of $125 billion that we have laid out below.***

111. By then, the Company's stock had fallen $9.71 per share from its initial offering price of $25.00 per share on October 30, 2025, to a closing price of $15.29 per share on November 24, 2025, a decrease of approximately 38.8%.

112. The truth continued to emerge on December 15, 2025, when Navan issued the 3Q26 Press Release. In the 3Q26 Press Release, the Company disclosed for the first time its operating results and financial condition that had existed by the time of the IPO but were omitted in the Registration Statement. For example, the 3Q26 Press Release reported "GAAP net loss was ($225 million), compared to a net loss of ($42 million) in the third quarter of fiscal year 2025." The 3Q26 Press Release also revealed that the Company's operating expenses had dramatically increased in comparison to the third quarter of the previous year, with sales and marketing expenses increasing from $58 million to $94.9 million, research and development increasing from $33 million to $51.1 million, and general and administrative expenses increasing from $34.9 million to $70.9 million, ultimately resulting in a loss from operations of $79.2 million.

113. The 3Q26 Press Release also announced that Defendant Butte "will depart as Chief Financial Officer, effective January 9, 2026," less than three months after the IPO. Defendant Butte would receive significant compensation upon separating from the Company, including accelerated vesting of equity awards, and a one-time cash payment of roughly $3.7 million.

114. On the same day, the Company filed a Form 10-Q with the SEC reporting its third quarter results for fiscal year 2026 (the "3Q26 10-Q"). The 3Q26 10-Q disclosed Navan's quarterly GBV for the first time. Without that information, investors had been unable to calculate quarterly usage yield because the Registration Statement reported only annual and semi-annual GBV, not quarterly GBV. The new figures showed that Navan's usage yield had fallen to 6.87% by the time of the IPO, down from 7.45% in the third quarter of the previous year.

115. Also on December 15, 2025, the Company held the 3Q26 Earnings Call. During that call, Defendant Cohen confirmed that Defendant Butte had been hired only to prepare Navan to go public and that her departure after the IPO had been contemplated long before the IPO, stating, in relevant part:

> Much like the role she played earlier in her career at the New York Stock Exchange, Amy helped build out our finance organization and prepare the company for the public markets. With our listing now complete and the business

> carrying strong momentum, it was the right time for her to move on to find her next opportunity.

116. During the question-and-answer portion of the 3Q26 Earnings Call, when asked if Defendant Butte's departure was "always part of the plan here for . . . Amy, to move on after the IPO is completed?" Defendant Cohen responded affirmatively, stating, in relevant part:

> ***Yes.*** . . . Amy was playing a critical role of building our finance organization and making our company ready for being public. But we kind of -- we felt or Amy felt it with our listing now complete and momentum underway, which we just shared with you across the business, and you can see it in the results, Amy decided that it's time for her to move on to our next opportunity. Me and the Board supported it.

117. Also during the 3Q26 Earnings Call, Defendant Butte discussed the Company's decline in usage yield and how R&M's slowing growth had been an issue for the Company, stating that "[u]sage yield was 6.9%, down from 7.5% in Q3 fiscal year '25. As a reminder, usage yield can vary by quarter depending on the timing of supplier volume bonuses, quarterly mix and travel activity and trends in our higher-yielding R&M business."

118. When an analyst asked Defendant Butte about Navan's declining usage yield, she described multiple headwinds affecting the Company that were present at the time of the IPO, including R&M's slower growth and the Company's PLG strategy, stating, in relevant part:

> So we still feel comfortable with thinking about kind of a 7% rate. Remember that we have headwinds and we have tailwinds going into that. ***So the headwinds are Reed & Mackay***, our more traditional legacy business has higher yields because it has a higher percentage of meetings and events and VIP. It is growing slower than our on-platform business. Therefore, as it becomes a smaller percentage of our total revenue base, the yield impact is a headwind to our overall usage yield.
>
> In addition, ***PLG's growth, particularly outside the U.S. is faster growing. It's the opposite and has a smaller yield than that 7%***, something that we're looking at, can we attach more products rather than just travel on to that PLG or growth customer.

119. Moreover, during the 3Q26 Earnings Call, Defendant Butte stated that, immediately after the IPO, Navan began evaluating where it could extend more credit to

customers and adjust payment terms in light of the Company's improved capital structure, stating, in relevant part:

> And in particular, short term, we're looking at being able to attach more payments, being able to leverage the improved capital structure and balance sheet.
>
> For example, ***immediately after the IPO***, we sat down with our enterprise account management team and talked about where we could extend more credit to customers, where it made sense, how we think about terms so we can be more competitive in the marketplace. . . .
>
> [W]ith the improved capital structure, we are lowering our overall cost of capital, and we're getting better terms with our partners, and we think that will be an uptick to our usage yield.

120. On this news, the Company's stock price declined $1.74 per share, or approximately 11.8%, to close at $12.90 per share on December 16, 2025.

121. Analysts reacted negatively to these revelations. For example, in the publication Skift, analysts indicated that "Butte framed her exit as planned." In another article posted in Calcalist, it was reported, in relevant part, that:

> [Navan's] earnings release brought two headline developments: ***sharply widening losses and the impending departure of the company's chief financial officer.***
>
> Navan reported third-quarter revenue of $195 million, up from $151 million in the same period last year . . . . ***But losses ballooned. Net loss widened to $225 million for the quarter, compared with $42 million a year earlier*** . . . .
>
> ***The optimistic tone contrasted with investor reaction.*** Monday's decline follows weeks of volatility since Navan's listing, which was the largest IPO by an Israeli company this year but quickly faltered. ***Shares dropped sharply in their first days of trading and continued to slide in subsequent sessions, reflecting investor unease over valuation, debt levels and the timing of the offering.***

122. These negative reactions were echoed in numerous publications, with BTN Europe, Jefferies, Goldman Sachs, BTIG, and Morgan Stanley highlighting Defendant Butte's unusual departure immediately after Navan's IPO.

123. Analysts also reacted negatively to the Company's more aggressive lending practices, an abrupt shift from Navan's more conservative credit practices from before the IPO.

For example, on December 16, 2025, Needham underscored the significance of Navan's shift as "Risks to Target," stating that ***"[c]orporate card customers could default at a higher rate,*** causing losses due to an increase in doubtful accounts."

124. Analysts also revised their financial outlooks for Navan. For example, Citizens lowered its outlook for fiscal year 2026 and doubled Navan's projected non-GAAP losses from $0.29 per share to $0.65 per share, reducing expectations for the Company's near-term profitability.

125. After the Company released its third quarter earnings, the Individual Defendants met privately with securities analysts to explain the decline in usage yield. Those meetings revealed that additional material information had not been disclosed in the Registration Statement, the 3Q26 Press Release, or the 3Q26 10-Q, including IPO-related accounting changes, pricing pressures from enterprise customers, and the effect that structural headwinds had already had on Navan's usage yield by October 30, 2025.

126. For example, on January 7, 2026, Goldman Sachs reported that Navan's declining usage yield by the IPO was attributable to an accounting change and certain contract reclassifications the Company had never previously disclosed. The report also revealed that Navan's customers' negotiated rates with travel partners were pressuring the Company's pricing, stating, in relevant part:

> Navan has underperformed meaningfully since IPO. . . .
>
> ***There is a tradeoff between GBV growth and Yield*** . . . there could be some pricing pressure as large companies often have their own corporate negotiated rates. ***Yield in the last quarter declined partly due to an accounting change in their accounting assumptions as they prepared for the IPO and a contract reclassification from usage to revenue.***

127. Jefferies similarly confirmed that the Individual Defendants identified faster growth in lower-yield PLG channel and pricing concessions to large enterprise customers as Navan continued to face headwinds as to usage yield, stating that "[h]eadwinds to the Usage Yield include faster PLG channel growth (esp. ex-US) and negotiated rates for very large enterprises."

128. On January 14, 2026, Needham reported that Navan's ten-day payment term that was repeatedly emphasized in the Registration Statement stemmed from a temporary, pre-IPO tightening of customer credit, and that the Company was already relaxing these restrictive payment terms immediately after the IPO, stating, in relevant part: ***"Before the company's IPO, Navan gated its payment business due to balance sheet concerns by significantly reducing payment terms from 30 days to 7 days and lowering rewards rates. Immediately after the IPO, Navan normalized their credit terms."***

129. Needham also reported that Navan's management attributed the pressures on the Company's usage yield to undisclosed factors that existed at the time of the IPO, including, but not limited to, lower commissions from enterprise customers, lower-yielding PLG business, and stalling R&M business, stating, in relevant part: "Newer, faster growing enterprise and SMB segments are a modest headwind to yield over time. Enterprise has lower commissions due to negotiated rates while PLG lacks a per-trip fee. . . . In addition, Reed & Mackay continues to grow slower than the overall business, creating a yield headwind."

130. Throughout January 2026, analysts who had independently met with the Individual Defendants consistently identified the same explanations for Navan's declining usage yield. On January 20, 2026, Loop Capital summarized the Individual Defendants' explanation of the factors affecting the Company that were not disclosed in the Registration Statement, stating, in relevant part:

> ***A key investor concern following Navan's F3Q print was the downward slide in usage yield*** – the effectiveness at converting GBV into revenue – which declined to 6.9% from 7.5% a year earlier. ***Management attributed a third of the F3Q drop to one-time IPO-related accounting changes (reclassifying some usage revenue to subscriptions) and headwinds from the higher-yield Reed & Mackay business becoming a smaller part of the mix, and faster growth in the lower-yielding PLG segment.***

131. Furthermore, on January 29, 2026, Navan began to reveal that R&M was a distinct service model separate from the Company's Navan platform, contrary to what Navan had touted in the Registration Statement that the Company was a "unified, end-to-end" platform, stating, in

relevant part: "Navan . . . the leading all-in-one business travel, payments, and expense management platform, today announced that ***it will begin transitioning Reed & Mackay customers to the Navan platform.***"

132. After these disclosures, the Company's stock continued to fall from its $25.00 per share offering price on October 30, 2025, to a closing price of $10.79 per share on February 2, 2026, a decrease of approximately 56.8%.

133. The truth was fully revealed on March 25, 2026, when the Company held the 4Q26 Earnings Call. In the 4Q26 Prepared Remarks, Navan abandoned a critical premise in the Registration Statement—that Navan was a single, unified platform—and admitted that 20% of its business relied on human agents rather than its AI-powered platform. Navan therefore offered two distinct service models with materially different economics, growth rates, and margins. Specifically, the 4Q26 Prepared Remarks stated, in relevant part:

> To truly understand the power of our business, ***it is important to understand the economics and relative scale of our two primary service models*** - our AI-powered model delivered through our core Navan platform and our white-glove human agent powered service model delivered by Reed & Mackay ("R&M"). . . .
>
> In FY 2026, revenue generated from customers of ***our R&M service model accounted for just over 20% of our consolidated FY'26 revenue***. Our R&M service model relies primarily on human agents and, as a result, is more costly to operate than our core AI-powered platform. GBV and, in turn, revenue generated from customers of our R&M service model have also grown at a slower pace relative to our core platform as companies seek to modernize their business travel experience.

134. In the 4Q26 Prepared Remarks, Defendant Cohen further disclosed stark differences in the financial results of R&M and the Navan platform, including R&M's low, single-digit GBV and revenue growth and materially lower gross margins, stating, in relevant part:

> To give you a sense of the relative economics of the two models, in FY'26, GBV and revenue growth generated from customers of our Navan platform service model was in the high forties and just above 40%, respectively. ***By comparison, GBV and revenue growth generated from customers of our R&M service model were each in the low single-digits.*** Additionally, our R&M service model yielded

> ***gross margins that were substantially lower*** than the combined gross margins of both service models.

135. During the 4Q26 Earnings Call, both Defendant Cohen and Navan's new CFO Aurélien Nolf ("Nolf") disclosed that R&M had economics distinct from Navan's AI-powered platform, stating, in relevant part:

> [Cohen]: [T]here is another upside here, the economics of our AI platform, ***so gross margins, unit economics are completely different. the economics of the Reed & Mackay platform***. . . .
>
> [Nolf]: [T]he Reed [&] Mackay business is roughly 20% of our total revenue for FY '26. And ***they had a growth rate that was significantly lower than the core Navan platform***. In fact, the core Navan platform grew the high 40s from a GBV perspective and just above 40% from a revenue perspective. ***So there's clearly very, very different dynamic there.***

136. From the IPO through this final disclosure, the Company's stock price declined $15.85 per share, or approximately 63.4%, from its initial listing at $25.00 per share to a close of $9.15 per share on March 25, 2026. In the months following the IPO, the Company's stock price fell from its $25.00 offering price to as low as $8.10 per share—a decline of about 67.6%.

## HARM TO NAVAN

137. The Individual Defendants' misconduct directly and proximately caused Navan to lose and expend, and to lose and expend in the future, millions of dollars.

138. Those expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and the Individual Defendants, among others, as well as amounts paid to outside lawyers, accountants, and investigators in connection with that action.

139. Those expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

140. Furthermore, the Securities Class Action has exposed the Company to potentially massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

141. Plaintiff brings this action derivatively on behalf of and for the benefit of the Company to redress injuries it has suffered and will suffer directly and proximately as a result of the Individual Defendants' breaches of fiduciary duties.

142. Navan is named only as a nominal party in this action. This action is not collusive and does not seek to confer on this Court jurisdiction it would otherwise lack.

143. Plaintiff is a current shareholder of Navan and held shares continuously during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will fairly and adequately represent the Company's interests in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

144. A pre-suit demand on Navan's Board is futile and therefore excused. When this action was commenced, Navan's ten-member Board comprised Defendants Cohen, Twig, Horowitz, Kourey, Janmohamed, Williams, Liang, Patnam, and Zeev (the "Director Defendants"), together with non-party Shai Weiss ("Weiss," and together with Director Defendants, the "Directors"). Plaintiff therefore need show only that five Directors cannot exercise independent objective judgment about whether to bring this action or vigorously prosecute it. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability. Demand on the Board is accordingly unnecessary because it would have been futile.

145. The Director Defendants knew or should have known of the false and misleading statements issued on the Company's behalf, yet took no steps in a good faith effort to prevent or remedy that situation.

146. Each Director Defendant approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from the Company's stockholders, or recklessly and/or with gross negligence disregarded the wrongs alleged herein. They are therefore not disinterested parties.

147. Moreover, the Directors willfully ignored, or recklessly failed to inform themselves about, the obvious problems with the Company's internal controls, practices, and procedures and did not make a good faith effort to correct those problems or prevent their recurrence.

148. Defendant Cohen is neither disinterested nor independent and therefore cannot consider a demand. In addition to serving as a director and Chairman of the Board, Defendant Cohen co-founded Navan and serves as the Company's CEO. As conceded by the 2026 Proxy, Defendant Cohen is a non-independent director.

149. Defendant Twig is neither disinterested nor independent and therefore cannot consider a demand. In addition to serving as a director, Defendant Twig co-founded Navan and serves as the Company's CTO. As conceded by the 2026 Proxy, Defendant Twig is a non-independent director.

150. The Director Defendants are also named as defendants in the Securities Class Action and therefore face significant personal liability. That action asserts non-fraud claims under Sections 11, 12(a)(2), and 15 of the Securities Act based on alleged misstatements and omissions in Navan's Offering Documents.

151. Defendants Kourey, Patnam, and Zeev (the "Audit Defendants") and non-party Weiss serve on the Company's Audit Committee and, under the Audit Committee Charter, were specifically charged with assisting the Board in its oversight responsibilities concerning, inter alia, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board about the material misstatements and omissions concerning the Company's business and the adequacy of its internal controls alleged above. The Audit Defendants therefore cannot independently consider a demand to sue themselves for breaching their fiduciary duties to the Company, because doing so would expose them to substantial liability and threaten their livelihoods.

152. As members of the Board, the Director Defendants were and are subject to the Company's Code of Conduct. That Code goes beyond the basic fiduciary duties required by applicable laws, rules, and regulations and also requires the Directors to follow the Company's standards of business conduct. The Director Defendants violated the Code of Conduct by knowingly or recklessly participating in making and/or causing the Company to make the materially false and misleading statements alleged herein. Their violations create a substantial likelihood of liability for breach of fiduciary duties, making demand upon them futile.

153. All current members of the Board derive substantial revenue from the Company, control the Company, and are indebted to one another. These conflicts of interest have prevented the current Board members from calling the Director Defendants' conduct into question.

154. In addition, none of the Directors has taken remedial action to redress the conduct alleged herein.

155. The Directors' conduct described and summarized above could not have resulted from legitimate business judgment because it rested on bad faith and intentional, reckless, or disloyal misconduct. Accordingly, none of the Directors can claim exculpation from their violations of duty under the Company's charter. Because a majority of the Directors face a substantial likelihood of liability, they are self-interested in the challenged transactions and cannot be presumed capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company's shareholders. Demand is therefore excused as futile.

156. The acts alleged herein violate fiduciary duties owed by Navan's officers and directors and cannot be ratified.

157. For all of the reasons stated above, the Directors cannot consider a demand with disinterestedness and independence. A demand upon the Board is consequently excused as futile.

**CLAIM I**

***Against the Individual Defendants For Breach of Fiduciary Duty***

158. Plaintiff incorporates by reference and realleges every allegation set forth above as though fully stated herein.

159. The Individual Defendants owed fiduciary obligations to the Company. By reason of those fiduciary relationships, they owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

160. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

161. The Individual Defendants engaged in a sustained and systematic failure to discharge their fiduciary duties properly. Among other things, they breached their duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a result, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions cannot be characterized as a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162. In particular, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, inter alia, that: (i) Defendant Butte intended to depart from her CFO position following the IPO; (ii) the Company had increased its operating expenses during the third quarter of fiscal year 2026, resulting in a quarterly net loss of $225 million; (iii) the Company's usage yield had declined by the time of the IPO to 6.9%, down from 7.5% in the prior year; (iv) the Company's usage yield was being affected by various headwinds and undisclosed accounting changes; (v) R&M was not integrated into Navan's unified platform, but was a separate, slower-growing segment that represented roughly 20% of the Company's revenue and negatively impacted the Company's usage yields, margins, and financial performance; (vi) the Company overstated its TAM by $24 billion by including the Bleisure market; (vii) Navan sought to relax its payment terms and credit practices that it had described in the Registration Statement; (viii) the Company failed to maintain adequate internal controls; and (ix) as a result of the foregoing,

the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

163. The Individual Defendants further breached their fiduciary duties by failing to correct, and/or causing the Company not to correct, the false and/or misleading statements and omissions of material fact identified herein.

164. The Individual Defendants knew that the Company was engaging in the fraudulent scheme alleged herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth. They caused the Company improperly to engage in the fraudulent scheme and to fail to maintain adequate internal controls even though those facts were available to them. In good faith, the Individual Defendants should have taken appropriate action to correct the alleged scheme and prevent its continuation.

165. The Individual Defendants' failure to fulfill their fiduciary obligations directly and proximately caused the Company to sustain significant damages.

166. Because of the misconduct alleged herein, the Individual Defendants are liable to the Company. Their breaches of fiduciary duties directly and proximately caused the Company to suffer damage, both monetarily and to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the Company's stock price, resulting in an increased cost of capital and reputational harm.

167. Plaintiff, on behalf of Navan, has no adequate remedy at law.

## CLAIM II

***Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty***

168. Plaintiff incorporates by reference and realleges every allegation set forth above as though fully stated herein.

169. By encouraging and carrying out the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants each encouraged,

facilitated, and advanced breaches of their fiduciary duties. In doing so, each aided and abetted, conspired, and schemed with the others to breach fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct alleged herein.

170. Plaintiff, on behalf of Navan, has no adequate remedy at law.

**CLAIM III**

***Against the Individual Defendants For Unjust Enrichment***

171. Plaintiff incorporates by reference and realleges every allegation set forth above as though fully stated herein.

172. Through their wrongful acts, violations of law, and false and misleading statements and omissions of material fact made and/or caused to be made, the Individual Defendants were unjustly enriched at Navan's expense and to its detriment.

173. The Individual Defendants either benefited financially from the improper conduct, received bonuses, stock options, or similar compensation from Navan tied to Navan's performance or artificially inflated valuation, or received compensation that was unjust in light of their bad faith conduct.

174. As a shareholder and representative of Navan, Plaintiff seeks restitution from the Individual Defendants and an order requiring them to disgorge all profits, benefits, and other compensation procured through their wrongful conduct and breach of fiduciary and contractual duties.

175. Plaintiff, on behalf of Navan, has no adequate remedy at law.

**CLAIM IV**

***Against the Individual Defendants For Waste of Corporate Assets***

176. Plaintiff incorporates by reference and realleges every allegation set forth above as though fully stated herein.

177. The wrongful conduct alleged concerning the issuance of false and misleading statements was continuous, connected, and ongoing throughout the Relevant Period and caused continuous, connected, and ongoing harm to the Company.

178. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and the Individual Defendants against the Securities Class Action.

179. The Individual Defendants are liable to the Company for the resulting waste of corporate assets.

180. Plaintiff, on behalf of Navan, has no adequate remedy at law.

**CLAIM V**

***Against the Individual Defendants for Contribution Under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f))***

181. Plaintiff incorporates by reference and realleges every allegation set forth above as though fully stated herein.

182. As a result of the misconduct alleged above, Navan is a defendant in the Securities Class Action, which asserts claims against Navan under Sections 11 and 15 of the Securities Act.

183. Section 11(f)(1) of the Securities Act provides that a person who becomes liable to make a payment under Section 11 may recover contribution from another person who, if sued separately, would have been liable to make the same payment, subject to the statutory limitation concerning fraudulent misrepresentation.

184. The plaintiff in the Securities Class Action alleges that the Registration Statement filed with the SEC in connection with the Company's IPO contained numerous untrue statements of material facts and omitted material facts necessary to make the statements not misleading.

185. Navan is the registrant for the IPO, and the Individual Defendants named herein were responsible for the Registration Statement's contents and dissemination.

186. As issuer of the shares, Navan is strictly liable to the plaintiff in the Securities Class Action for the misstatements and omissions alleged there.

187. The plaintiff in the Securities Class Action alleges that none of the Individual Defendants conducted a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were true and not misleading.

188. Because of their positions of control and authority as Navan's officers and/or directors, the Individual Defendants were able to, and did, exercise control directly and/or indirectly over Navan's business and corporate affairs, including the wrongful acts alleged herein and in the Securities Class Action.

189. Accordingly, to the extent Navan becomes liable to make a payment under Section 11, Section 11(f) governs any right of contribution from persons who would have been liable to make the same payment. For outside directors, Section 11(f)(2) provides that liability is determined in accordance with Section 21D(f) of the Exchange Act, 15 U.S.C. § 78u-4(f).

190. Navan therefore seeks any contribution from the Individual Defendants under Section 11(f) of the Securities Act.

191. Plaintiff, on behalf of Navan, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing Navan to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company

and its stockholders from a repeat of the damaging events described herein, including, but not limited to strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations; strengthening the Company's internal reporting and financial disclosure controls; developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and strengthening the Board's internal operational control functions;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 23, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFICATION

I, Sekou Cherif, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Dated: 9/23/2026

DocuSigned by:

88B3AB4E8FCA444...

Sekou Cherif